1

────────── 2:15-cr-00340-RFB ──────────

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   UNITED STATES OF AMERICA,        )
                                     )  Case No. 2:15-cr-00340-RFB
5                  Plaintiff,        )
                                     )  Las Vegas, Nevada
6         vs.                        )  Monday, June 13, 2016
                                     )  1:28 p.m.
7   RICK VAN THIEL,                  )
                                     )  SUPPRESSION HEARING
8                  Defendant.        )
    ─────────────────────────────────)

9

10

11        REPORTER'S TRANSCRIPT OF CHRISTOPHER MATTHEWS' TESTIMONY

11                THE HONORABLE RICHARD F. BOULWARE, II,
12                    UNITED STATES DISTRICT JUDGE

13

14

    APPEARANCES:
15  For the Plaintiff:        **JARED GRIMMER, AUSA**
                              **CRANE POMERANTZ, AUSA**
16                            **DANIEL J. COWHIG, AUSA**
                              United States Attorney's Office
17                            501 Las Vegas Blvd. S, Suite 1100
                              Las Vegas, Nevada 89101
18                            (702) 388-6336

19  For the Defendant:        **WILLIAM C. CARRICO, ESQ.**
                              FEDERAL PUBLIC DEFENDER
20                            411 E. Bonneville Ave., Suite 250
                              Las Vegas, Nevada 89101
21                            (702) 388-6577

22

    COURT REPORTER:           Patricia L. Ganci, RMR, CRR
23                            United States District Court
                              333 Las Vegas Boulevard South, Room 1334
24                            Las Vegas, Nevada  89101

25  Proceedings reported by machine shorthand, transcript produced
    by computer-aided transcription.

─────── 2:15-cr-00340-RFB ───────

1                      INDEX OF EXAMINATIONS

2  TESTIMONY OF CHRISTOPHER MATTHEWS
      Direct Examination by Mr. Grimmer              3
3     Voir Dire by Mr. Carrico                      10
      Direct Examination by Mr. Grimmer            11
4     Cross-Examination by Mr. Carrico             24
      Redirect Examination by Mr. Grimmer          48
5

6                    GOVERNMENT'S EXHIBIT INDEX
   Exhibit No.                                 Admitted
7  3-11                                          11
   3-12                                          11
8  3-13                                          11
   3-15                                          13
9  3-16                                          13
   3-17                                          13
10 3-18                                          13

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-2:15-cr-00340-RFB-

 1          LAS VEGAS, NEVADA; MONDAY, JUNE 13, 2016; 1:28 P.M.

 2                              --oOo--

 3                   P R O C E E D I N G S

 4          THE COURT:  Please be seated.  We're going back on the

 5  record, and we will have a continuation of the hearing.

 6          Mr. Grimmer, are you prepared to call your next

 7  witness?

 8          MR. GRIMMER:  Yes, Your Honor.

 9          THE COURT:  Please do.

10          MR. GRIMMER:  Government calls Detective Matthews.

11          COURTROOM ADMINISTRATOR:  Please raise your right hand.

12          CHRISTOPHER MATTHEWS, having duly been sworn, was

13  examined and testified as follows:

14          COURTROOM ADMINISTRATOR:  Thank you.  Please state your

15  name for the record.

16          THE WITNESS:  Detective Christopher Matthews.

17                       DIRECT EXAMINATION

18  BY MR. GRIMMER:

19  *Q.*  Good afternoon, Detective Matthews.

20  **A.**  Good afternoon.

21  *Q.*  Please tell us, how is it that you are employed?

22  **A.**  I'm employed by the Las Vegas Metropolitan Police

23  Department.

24  *Q.*  And on September 30th, 2015, what unit were you assigned to?

25  **A.**  Counterterrorism section.

1  Q.  How long have you been assigned to the counterterrorism

2  section?

3  A.  Little over nine years how.

4  Q.  I'd like to turn your attention to September 30th, 2015.

5  Were you involved in a search of some property at 4928 East

6  Monroe Avenue in northeast Las Vegas?

7  A.  Yes.

8  Q.  Do you recall who the owner of this property was?  Did you

9  ever determine -- did you find out or know who the owner of that

10  property was?

11  A.  I had heard who it is, but I do not recall the name.

12  Q.  Do you recall who the individual was that was the target of

13  that search?

14  A.  Yes.

15  Q.  Who was that?

16  A.  Rick Van Thiel.

17         THE COURT:  Excuse me.  I'm sorry, Mr. Grimmer.

18         You understood, though, at the time, Detective, that

19  Mr. Van Thiel wasn't the owner of the property, though, right?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Okay.  But you just don't recall the name

22  of the person who was the actual owner as you sit on the stand?

23         THE WITNESS:  No, sir.  I do not recall the owner of

24  the property, but I recall the target of the investigation who

25  was allegedly residing on that property.

───2:15-cr-00340-RFB───

1          THE COURT:  Right.  But he wasn't the technical owner

2    of the property?

3          THE WITNESS:  That's correct.

4          THE COURT:  All right.  Thank you.

5          Go ahead, Mr. Grimmer.

6          MR. GRIMMER:  Thank you, Your Honor.

7    BY MR. GRIMMER:

8    *Q.*  Do you recall what the reason was for the search, what

9    crimes were being investigated?

10   **A.**  They were generally medical in nature, conducting medical

11   procedures without a license, and charges related to that.

12   *Q.*  Now, on October 20th, 2015, did you testify in a hearing in

13   Clark County, Nevada Justice Court about your role in this

14   search?

15   **A.**  Yes, sir.

16   *Q.*  Now, at that time did you say that you knew the scope of the

17   search, but only to a degree?

18   **A.**  I knew what I'd been briefed to.

19   *Q.*  Okay.  So was that statement accurate, to say that you knew

20   only to a degree?

21   **A.**  Yes.

22   *Q.*  And to what degree was that?

23   **A.**  Well, that we were looking for things that had been

24   delineated in the search warrant that we were there to assist

25   the other detectives with.

—2:15-cr-00340-RFB—

1  Q.  And if you could take a look at the binder in front of you?

2  A.  No binder, sir.

3       MR. GRIMMER:  May I approach the witness?

4       THE COURT:  Of course.

5  BY MR. GRIMMER:

6  Q.  All right.  Turning to the binder, let's take a look at the

7  document in Tab 1.  This is Government Exhibit 1.  Turning to

8  pages 2 and then 3, specifically paragraphs A through D.  If you

9  could review those just for a moment?

10 A.  Yes.

11 Q.  Now, did you understand, Detective Matthews, that these were

12 the items that you were searching for on that date?

13 A.  Yes.

14 Q.  Had you received a briefing prior to the search?

15 A.  Yes, sir.  We did.

16 Q.  Do you recall who gave that briefing?

17 A.  I am rather certain it was Detective Mead.  He may or may

18 not have had an assistant with him.  I do not recall.

19 Q.  Now, let's take a look at the document which is labeled

20 Government Exhibit 2.  That's at Tab 2.

21 A.  Yes.

22 Q.  Do you see your name on that document?

23 A.  I do.

24 Q.  Okay.  And is that your handwriting?

25 A.  Yes, it is.

———— 2:15-cr-00340-RFB ————

1  Q.  Why is your name on that document?

2  A.  This was a sign-in sheet for the briefing, I believe.

3  Q.  And so did you sign in because you were at the briefing?

4  A.  Yes.

5  Q.  Thank you.

6        Now, at that briefing do you recall what was discussed?

7  A.  Generally, yes.  I mean, it...

8  Q.  Were you given the outline of the search, what the reason

9  for the search was?

10 A.  Yes, sir.

11 Q.  Now, again, back in October 20th of last year, did you

12 state -- do you state that you didn't know what the reason for

13 the execution of the search warrant was?

14 A.  Well, I knew the reason was to look for these medical

15 devices, things that were delineated in the briefing which came

16 from the search warrant, but I was unaware of whether this was

17 the sole case or this was a piece of a larger case.

18 Q.  Now, again, referring to both the search warrant in Exhibit

19 1 and the sheet from the briefing in Exhibit 2, do you recall

20 what it -- the reason for the search warrant, what it was that

21 you were looking for?

22 A.  Yes, we were going to be looking for things that were --

23 that would be evidence of the crimes delineated in the search

24 warrant.  Those items were laid out in those paragraphs.

25 Q.  Now, once again, taking you back to October 20th of last

1  year.  In state court did you state that you were assigned areas

2  to search to look for possible evidences of crimes?

3           Let's go to the first part of that statement first.  Is

4  that your statement?

5  *A.*  Yes.

6  *Q.*  Let's go to the first part of that statement.  Can you tell

7  us about the assigned areas of search on the piece of property?

8  Can you tell us about what were the areas that you were assigned

9  to search?

10  *A.*  The areas that I was assigned to search?

11  *Q.*  Yes.

12  *A.*  I was assigned to search a particular vehicle and the entire

13  property, and the places within that property were broken down

14  into several smaller locations merely as a -- to ease the

15  logistics of doing so.  There were different law enforcement

16  officers assigned to different portions, and my portion when I

17  first reported there was the vehicle, which we later learned

18  belonged to Mr. Van Thiel.

19           THE COURT:  I'm sorry.  When you say "the vehicle," was

20  this an actual vehicle or was this the container?  Because if

21  you look at the property, it looks like there -- some places

22  there are vehicles.  Some places there are trailers.  Some

23  places there appear to be containers.  Could you be more

24  specific?

25           THE WITNESS:  I understand.  I was specifically

—2:15-cr-00340-RFB—

1  assigned to search what we believed to be Rick Van Thiel's

2  automobile.

3            THE COURT:  Automobile.

4            THE WITNESS:  Which was on that property.

5            THE COURT:  Okay.  And what was the automobile?  Could

6  you describe it?

7            THE WITNESS:  I'm sorry, sir?

8            THE COURT:  Could you describe it, if you remember?

9            THE WITNESS:  It was a light gray silver-colored Volvo

10  station wagon, I believe.

11            THE COURT:  Okay.  Perfect.  Thank you.

12  BY MR. GRIMMER:

13  *Q.*  Now, as to the second portion of your prior statement about

14  possible evidence of crimes, what were you referring to there?

15  *A.*  Well, I probably could have been clearer.  You know, we

16  don't know that we're going to find anything there.  That's why

17  the possible, but we were looking for evidence of the crimes as

18  laid out in the warrant and the briefing by Detective Mead.

19  *Q.*  Were you looking for evidence of any crimes?

20  *A.*  No, we were looking for evidence of the crimes that were

21  listed within the warrant.

22  *Q.*  Now, in the binder in front of you, let's turn to Tab 3-11,

23  which is marked as Government Exhibit 3-11.  Also take a look at

24  that one, 3-12 and 3-13, please.

25  *A.*  Yes.

————— 2:15-cr-00340-RFB —————

1   *Q.*   Do you recognize what's shown in these pictures?

2   **A.**   Yes, I do.

3   *Q.*   Do these photographs fairly and accurately depict the items

4   that are shown?

5   **A.**   Yes.

6   *Q.*   And were these items located on 4928 East Monroe on

7   September 30th, 2015?

8   **A.**   Yes, sir.  They were.

9            MR. GRIMMER:  Your Honor, government seeks to admit

10   Government Exhibits for Identification 3-11, 12, and 13 as

11   evidence.

12            THE COURT:  Mr. Carrico?

13            MR. CARRICO:  Yes, Your Honor.  If I may just ask on

14   voir dire one question about 3-12?

15            THE COURT:  Sure.

16                              VOIR DIRE

17   BY MR. CARRICO:

18   *Q.*   Detective, on Exhibit 3-12 could you look at that and

19   describe here on the record what it is a picture of?

20   **A.**   It is an overall picture of items -- some of the items that

21   I found in the glove box of the vehicle that's shown in the

22   3-11.

23            THE COURT:  Okay.

24            THE WITNESS:  And those are things that show

25   association of that vehicle with Mr. Van Thiel.

PATRICIA L. GANCI, RMR, CRR   (702) 385-0670

—2:15-cr-00340-RFB—

1  BY MR. CARRICO:

2  *Q.*  So that is a photograph of an open glove box in the Volvo.

3  Is that correct?

4  *A.*  Yes, sir.  It is.

5        MR. CARRICO:  Okay.  That's all I needed.  No objection

6  to any of those, Your Honor.

7        THE COURT:  Okay.  Exhibits 3-11 and 3-12 and 3-13 will

8  be admitted.

9        (Government Exhibits 3-11, 3-12, and 3-13 are

10  admitted.)

11        MR. GRIMMER:  Thank you, Your Honor.

12                      DIRECT EXAMINATION

13  BY MR. GRIMMER:

14  *Q.*  Now, regarding -- let's go to 3-11.  Is this the silver

15  station wagon that we just discussed?

16  *A.*  Yes, sir.  It is.

17  *Q.*  And was this where you initiated your search?

18  *A.*  Yes.

19  *Q.*  Turning to 3-12.  Again, as defense has mentioned, this is

20  an open glove compartment.  Is that what you stated?

21  *A.*  Yes.

22  *Q.*  And do you see a name on a document there in this open glove

23  compartment?

24  *A.*  Well, there is a name on what appears to be the insurance

25  form on the right side of the photograph.  It's labeled GEICO.

─ 2:15-cr-00340-RFB ─

1    *Q.*  Okay.  And what is that name?

2    **A.**  That's the geico.com, the vehicle insurance for the -- for

3    the Volvo.

4    *Q.*  Can you read to us the name that you read there?

5    **A.**  Rick Van Thiel.

6    *Q.*  Thank you.

7           Turning to 3-13.  Tell us what does this show in the

8    document, this photograph.

9    **A.**  3-13 is a semi-trailer that was also on the property.  It

10   is -- it is located on the east side.  As you're looking at the

11   vehicle, the Volvo in that photograph, that trailer is to the

12   viewer's rear.

13   *Q.*  Is this what you would describe as an 18-wheel trailer?

14   **A.**  Yes, sir.  It is.

15   *Q.*  Now, 3-14 has already been admitted.  We will talk about

16   that in a minute, but let's turn to what's been marked as

17   Government Exhibits 3-15, 3-16, 3-17, and 3-18.  If you could

18   review those previously and let us know if you recognize those.

19   **A.**  Yes, sir.  I recognize those.

20   *Q.*  Do these photographs fairly and accurately depict the items

21   that you observed on September 30th, 2015?

22   **A.**  Yes.

23   *Q.*  And these items were at the property at 4928 East Monroe on

24   September 30th?

25   **A.**  Yes.

—2:15-cr-00340-RFB—

1          MR. GRIMMER:  Your Honor, the government seeks to admit

2    Exhibits 3-15 through 3-18 into evidence.

3          THE COURT:  Mr. Carrico?

4          MR. CARRICO:  One moment, Your Honor.

5          No, I have no objection.

6          THE COURT:  Those will be admitted.

7          (Government Exhibits 3-15, 3-16, 3-17, and 3-18 are

8    admitted.)

9          THE COURT:  Just a quick question, Detective.  If you

10   look at 3-15 and then 3-16, it would appear that one is a front

11   part of a safe and then it would appear that 3-16 is the -- that

12   same safe that's opened later.  Is that right?

13         THE WITNESS:  That is correct.

14         THE COURT:  But when you arrived on the scene of this

15   trailer, the safe door was closed as it is in 3-15?

16         THE WITNESS:  Correct.

17         THE COURT:  Was that tape on there?

18         THE WITNESS:  I'm sorry, sir?

19         THE COURT:  Was that blue tape on the safe?

20         THE WITNESS:  Yes, sir.  I believe so.

21         THE COURT:  Okay.  Thank you.

22         Go ahead, Mr. Grimmer.

23         MR. GRIMMER:  Thank you, Your Honor.

24   BY MR. GRIMMER:

25   *Q.*  Now, 3-15 tell us again what this describes.  Again, it's a

---
—2:15-cr-00340-RFB—

1  safe?

2  **A.**   Yes.

3  Q.   Where was this safe located?

4  **A.**   It was located inside of the fifth-wheel trailer.

5  Q.   Okay.  Let's go back for a moment to 3-14.  This shows the

6  rear of the trailer.  Is that correct?

7  **A.**   Yes.

8  Q.   Now, when you arrived to do the search, were these two doors

9  at the back of the trailer open or closed?

10  **A.**   No, the doors were closed.

11  Q.   And so this photograph was taken after they were opened

12  pursuant to the search?

13  **A.**   Yes.

14  Q.   Now, can you tell us what are some of the items that you

15  observed both in this picture as well as part of the search in

16  this trailer?

17  **A.**   The trailer appeared to be used as general storage for all

18  types of items.  In the -- just inside the entry to the trailer

19  you see these yellow items.  They are very large, heavy-duty,

20  like a commercial-grade weight-lifting equipment, both the racks

21  and the weights, a Universal machine if you're familiar with

22  those.  It's taken apart and it's distributed around.  There are

23  -- if I recall right, there was drilling presses.  There was

24  file cabinets.  They're -- almost the entire like forward

25  two-thirds of the right side of that trailer as you're looking

---

1  at it was full of shelving and boxes that had things like very

2  large rubber dildos, DVD porn movies, all types of those types

3  of accoutrements.  I believe we even had a washer and dryer

4  towards the front of the trailer.  Excuse me.

5          As you're looking at the photo, in the center on the

6  floor you see like a triangular blue object.  I don't remember

7  what that is, but behind that you are going to see an object

8  with a green box.  And then the safe was on the other side of

9  that on the left side of the trailer as you're looking at it.

10 *Q.*  So give it a percentage, about how far into the trailer was

11 the safe?

12 *A.*  I'd say that's maybe -- maybe 15 feet.

13 *Q.*  Okay.  Which is --

14 *A.*  Maybe 25.  The first 25 percent, first third of the trailer.

15 *Q.*  Thank you.

16          In the trailer did you happen to find any items which

17 were related to the practice of medicine?

18 *A.*  I believe some other detectives found some of those items.

19 I did not personally find those items.  I saw them after they

20 were pulled out, and they found them in different locations

21 within the trailer.

22 *Q.*  But you -- so you did observe some items -- although you may

23 not necessarily have found them, you did observe some items in

24 the trailer related to the practice of medicine?

25 *A.*  Yes.

—2:15-cr-00340-RFB—

1   *Q.*  Do you recall what types of items those were?

2   **A.**  No, sir.  I do not.

3   *Q.*  Now, turning back to 3-15.  The safe door was closed.  Is

4   that correct?

5   **A.**  Yes.

6   *Q.*  Was it -- was it locked or could you open it?

7   **A.**  It was locked.

8   *Q.*  And so then what did you do with the locked safe?  What were

9   the next steps you took?

10  **A.**  We notified a detective that was coordinating, which was

11  Detective Mead, and what he -- who he notified after that, I do

12  not know.  However, the result was a locksmith was brought out

13  to the scene in order to open the safe.

14          THE COURT:  Excuse me.  And, Detective Matthews, how

15  long after you arrived on site did the locksmith arrive

16  approximately?

17          THE WITNESS:  Sir, I can't tell you that.  I'm not

18  sure.  It was -- it was very hot.  We had gloves on.  I had

19  taken my watches and bracelets off because we were trying to

20  take precautions for what we may encounter.  So we had heavy

21  rubber gloves on.  Sometimes some of the people had what you

22  probably term as a surgical mask on, and I was not looking at my

23  watch.  I'm not sure.

24          THE COURT:  I'm just trying to construct some type of

25  time frame.  You were on the property for several hours.  Is

1  that right?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  And you initially did a search of that

4  silver Volvo you saw?

5          THE WITNESS:  Yes.

6          THE COURT:  And then after that you went to do a search

7  of the container?

8          THE WITNESS:  Yes.

9          THE COURT:  And then you encountered the safe and

10  contacted the detective, We need to have a locksmith brought

11  out?

12          THE WITNESS:  Yes.

13          THE COURT:  So would it be fair to say that that took

14  like a few hours, two or three hours, from the time you arrived

15  on the property until the locksmith arrived?

16          THE WITNESS:  That would be fair to say, sir, but it

17  would be a guess on my part.  But that's fair.

18          THE COURT:  Okay.  So it wasn't within the first 20 or

19  30 minutes of your arrival?

20          THE WITNESS:  Oh, no.  Absolutely not.

21          THE COURT:  So it's at least an hour or two at least

22  after your arrival?

23          THE WITNESS:  Yes.

24          THE COURT:  Okay.  I'm just trying to get a sense of

25  the timing.  Thank you.

—— 2:15-cr-00340-RFB ——

1        Go ahead, Mr. Grimmer.

2  BY MR. GRIMMER:

3  Q.  Now, prior to the search, were you aware of the defendant's

4  criminal history?

5  A.  Yes.

6  Q.  Do you recall what that was?

7  A.  I can't recall the specifics without looking at a printout,

8  which I don't have reference to right now, but I was aware that

9  he was an ex-felon and --

10  Q.  Was that information received at the briefing?

11  A.  Yes.

12  Q.  Let's turn to 3-16.  Tell us, what does this show?

13  A.  This shows the safe from the previous photo that is now

14  open, and you see some of the items that were contained in it.

15  Q.  And tell us, what are the items that were contained inside

16  this locked safe?

17  A.  These are -- excuse me.  These are positioned for some of

18  these early photographs.  Originally the box you see, the lid

19  was closed.  And that weapon was in the box that was inside on

20  the -- I believe on the left side of the safe.  And if you look

21  up in the top right of the safe, you can just see a -- what

22  appears to be a dark-colored handgun.  That, in fact, did turn

23  out to be a semi-automatic pistol that was placed on top of that

24  box.  And then if you also look in the safe, on the second shelf

25  to the left side you see an oddly-shaped and colored object

1  which we were only able to identify because of the light.  But

2  it turned out to be a plastic -- clear plastic baggie containing

3  loaded ammunition.

4        And that was on the left side of the safe.

5  *Q.*  Thank you.

6        So when the safe was opened by a locksmith, what was

7  the first thing you saw inside the safe?

8  **A.**  The first thing we saw as the door came open was the

9  semiautomatic pistol laying on top of the box on the left side

10  of the safe.  And then you could just see a little bit of the

11  bag of the ammunition to its right on the right side of the

12  safe.

13        THE COURT:  So just to be clear, Detective, there were

14  two weapons that were found?

15        THE WITNESS:  Yes, sir.

16        THE COURT:  Okay.  And the weapon -- if you look at

17  3-16, that weapon was inside the box and then there appears at

18  least to be some glint of another weapon up inside the safe in

19  the upper right-hand corner.  Is that correct?

20        THE WITNESS:  Correct.  But their positioning here is

21  for a photo.  That was not the original position.

22        THE COURT:  Right.  And what you've testified to is

23  that originally the box that's at the bottom of this photo was

24  closed and inside the safe?

25        THE WITNESS:  Yes, sir.

─── 2:15-cr-00340-RFB ───

```
 1          THE COURT:  But the handgun that was on the top was
 2   clearly visible?
 3          THE WITNESS:  Yes, sir.
 4          THE COURT:  Okay.  Thank you.
 5   BY MR. GRIMMER:
 6   Q.  Did you or your office obtain a second search warrant after
 7   finding these guns?
 8   A.  Yes, sir.  We did.
 9   Q.  Do you recall what that search was in relation to?
10   A.  I don't recall the specifics of the search warrant.  It
11   was -- we were told in the briefing that if we found weapons, to
12   stop, which we did, and made the notification to the other --
13   the detectives leading it.  They began the process of obtaining
14   another warrant which was -- would be for these weapons and the
15   safe.  I have not read that.  I have not seen it.  That was not
16   my part of the operation.
17   Q.  But you understand that a search warrant was authorized to
18   be able to seize these guns?
19   A.  Yes, sir.
20   Q.  And were you the individual who seized these guns after the
21   search warrant was obtained?
22   A.  Yes.
23   Q.  Let's now turn to 3-17.  Please tell us, what does this
24   show?
25   A.  This shows the weapon that was in the cardboard box.
```

1  Q.  And how would you -- do you recall what type of weapon this

2  is, what you would refer to it as?

3  A.  I can't read it on this page, but if I remember right, it's

4  a -- commonly referred to as a MAC-10 made by Military Armaments

5  Corporation.

6  Q.  And, again, you say that this was inside a box?

7  A.  Yes.

8  Q.  And this was not visible to you when you -- when the door

9  was first opened by the locksmith?

10  A.  No.  Only after the items were later retrieved and the boxes

11  opened up did this weapon become visible.

12  Q.  Do you recall if there was any names on the box that

13  contained this weapon?

14  A.  I believe we -- Rick's name was on the box.  Rick Van

15  Thiel's name was on an address label in a box, I believe.

16  Q.  Turning to 3-18.  Please tell us, what does this depict?

17  A.  This appears to be the semiautomatic pistol that was laying

18  on top of the box inside of the safe.

19  Q.  Do you recall whether this weapon was loaded or not?

20  A.  I believe it was.

21        MR. GRIMMER:  If I may have the Court's indulgence for

22  a moment.

23        THE COURT:  Did you offer 3-17 and 3-18?

24        MR. GRIMMER:  I believe we did, but if not --

25        THE COURT:  Did they offer those, Blanca?  Did I admit

—2:15-cr-00340-RFB—

1  those?

2          MR. GRIMMER:  Did we offer those?  Yes.  So they are

3  admitted into evidence as Government's Exhibit 3-17 and 3-18.

4          THE COURT:  Okay.

5          MR. GRIMMER:  If I may just have a moment.

6          THE COURT:  Sure.  Take your time.

7          (Government counsel conferring.)

8          MR. GRIMMER:  Just a few more questions.

9  BY MR. GRIMMER:

10  Q.  Now, when you first opened the safe, in addition to the guns

11  in the box, is there anything that you happened to see in the

12  safe?  I'm sorry.  Let me start over again.

13          When the safe was first opened by the locksmith...

14  A.  Yes.

15  Q.  Were the guns in the box the first thing that you saw?

16  A.  The first thing we saw?

17  Q.  Yes.

18  A.  Was the -- there was just enough light to kind of show the

19  rear of the back strap, of the grip of the pistol that was on

20  top of the box.  And that was on the left side of the safe as

21  you're looking at it, as you're looking at the front of it.  And

22  the baggie of ammunition was to the rear, kind of rear and to

23  the right of the box.  You could just see a little bit of the

24  bag, not the complete bag, just a portion of it.

25  Q.  Okay.  Now, let's go to 3-16.  This is something I'd like to

1   explore with you a little bit.  You see -- does that look like a

2   wire or a string on the left-hand side of the safe?

3   *A.*   Yes.

4   *Q.*   Can you tell us a little bit about what that was related to?

5   *A.*   We first opened -- when we first opened the safe after the

6   locksmith had come, everything was ready to go, ready for us to

7   open it up.  As the safe was pulled open, I saw what appeared to

8   be a plunger device on the top left, similar to what you may

9   encounter in a refrigerator that's pressed closed until you open

10  it and the light comes on.

11         Stopped the opening of the door immediately because I

12  saw that and also what appeared to be a fine wire dropping down

13  behind this very small plunger box.  That concerned me because

14  I've encountered other things of a similar nature, and they have

15  been used both as alarm devices and also as some type of

16  initiator or detonator for a booby-trap.  So I didn't want to go

17  any further unless someone else looked at it.

18  *Q.*   So did someone else look at it?

19  *A.*   Yes.

20  *Q.*   And what did they determine should be done next?

21  *A.*   They determined that -- after the other people looked at,

22  they said that, You're okay.  Go ahead and conduct your search.

23  *Q.*   Were any other units called out as a result of this?

24  *A.*   Oh, yes, sir.  I'm sorry.  I misunderstood you.  The bomb

25  squad was called out to look at it.  And after they went inside,

—2:15-cr-00340-RFB—

1  followed their procedures, made their assessment, their

2  assessment was that it was not a device and it was safe for us

3  to go in and conduct our search.

4           MR. GRIMMER:  Thank you.  No further questions.

5           THE COURT:  Thank you, Mr. Grimmer.

6           Mr. Carrico.

7           MR. CARRICO:  Thank you.

8                        CROSS-EXAMINATION

9  BY MR. CARRICO:

10  Q.  Detective Matthews, you started your testimony today by

11  recalling a prior testimony given in a preliminary hearing, yes?

12  A.  Yes, sir.

13  Q.  And that was back in October of 2015.  Is that correct?

14  A.  I believe so.

15  Q.  All right.  Did you review that testimony before your

16  testimony here today?

17  A.  No, I did not review my testimony.  No, sir.  That's the

18  best of my recollection as I answered.

19  Q.  Okay.  Fair enough.

20          Now, back in October of 2015, isn't it true that you

21  were asked if you knew the purpose of your search?  Do you

22  remember being asked that question?

23  A.  Yes, or a close approximation of that question.

24  Q.  Okay.

25  A.  Again, sir, I'd have to review the documents if you wanted a

1 precise answer.  But to the best of my recollection, I was asked

2 a question like that.

3 *Q.*  Right now I just want to get the depth of your recollection

4 and then, perhaps, we'll review the exact language.  But do you

5 recall here today whether or not -- that you said that you did

6 not know what the reason for the execution of the search warrant

7 was?

8 **A.**  I'm not sure if those are my exact words.

9 *Q.*  Okay.  I have here a copy of your preliminary hearing

10 testimony given back on October 20th, I believe, 2015.  And I'm

11 going to direct your attention to page 34 and ask that you read

12 it over.

13            MR. CARRICO:  May I approach, Your Honor?

14            THE COURT:  Yes.

15 BY MR. CARRICO:

16 *Q.*  Just take a moment and read that over to yourself, don't

17 read it out loud, and then let me know when you're done, please.

18 **A.**  Okay.  Page 34.

19 *Q.*  Thank you.

20            Now, it's true, is it not, that you were asked

21 regarding the search warrant whether or not you had any reason

22 to believe that you were looking for firearms as a part of that

23 search warrant?  Do you remember that question?

24 **A.**  Yes.

25 *Q.*  And isn't it true, sir, that you said:  *I do not know what*

─ 2:15-cr-00340-RFB ─

1    *the reason of the execution of the search warrant was.  I merely*
2    *assigned areas to the search for possible evidence of crimes*?
3    *A.*  Yes.
4    *Q.*  And then later on, as you've just testified, when the safe
5    was opened, you believed it was necessary to request a second
6    search warrant?
7    *A.*  I didn't make that determination.  That is incorrect.
8    *Q.*  Okay.  I'm going to ask you about the obtaining of the
9    second search warrant then to explore what you do remember.
10   There was a second search warrant to seize the guns, right?
11   *A.*  There was a second search warrant to search for the guns.
12   *Q.*  Well, just to be clear, by that point you had put eyes on
13   firearms in the safe.  Isn't that correct?
14   *A.*  I had seen what I believed to be a firearm and what I
15   believed to be ammunition.  I did not construct the warrant.  I
16   was not the affiant for it.
17   *Q.*  No, I know you weren't.
18   *A.*  I was merely the searcher.  So what specifically was put
19   into that warrant, I'm not sure.  But I did -- after it was
20   obtained, I did continue with the search for those items I
21   believed to be firearm.
22   *Q.*  Okay.  And I believe you testified just moments ago that you
23   were instructed if you found firearms that you were to stop?
24   *A.*  Yes, sir.
25   *Q.*  And you stopped?

—— 2:15-cr-00340-RFB ——

1   *A.*   Yes.

2   *Q.*   And you notified someone about your detection of the subject

3   firearms.  Is that correct?

4   *A.*   Yes.

5   *Q.*   And who did you tell about that?

6   *A.*   I believe we informed Detective Mead because Detective Mead

7   was the -- he was acting as the lead in this case and he had

8   performed the briefing earlier, prior to the execution of the

9   original search warrant.

10   *Q.*   Okay.  It was Detective Mead who had given you the briefing

11   that you had signed in to just a day or two before.  Is that

12   correct?

13   *A.*   I don't recall signing into that a day or two before.

14   *Q.*   Well, I won't quibble over dates, but you remember the

15   sign-in sheet that you saw?

16   *A.*   I remember a sign-in sheet that...

17   *Q.*   That you saw here today?

18   *A.*   That they showed me, yes.

19   *Q.*   Yes.  That's the one I'm talking about.  It is Exhibit 2 in

20   your binder, sir.

21   *A.*   Yes, I'm well aware of that and that is true.  That is a

22   sign-in sheet that I signed.

23   *Q.*   Do you recall when you signed -- what the date was that you

24   signed that, your name to that sheet?

25   *A.*   We signed that the day of the -- that we executed the search

—2:15-cr-00340-RFB—

1 warrant just prior to the operation.  This was -- if I'm not

2 mistaken, this a sign-in sheet for the briefing that we received

3 from Detective Mead.

4 *Q.*  Okay.  Well, how many briefings did you receive from

5 Detective Mead?

6 *A.*  One for sure, which was what I signed in for here.  There

7 may have been one or two smaller ones, like updates, but I can't

8 recall for sure.

9 *Q.*  And is it your testimony today that you signed this before

10 you executed the search warrant?

11 *A.*  Yes.

12 *Q.*  Okay.  And at that time he did not pass out copies of the

13 search warrant, did he?

14 *A.*  No.

15 *Q.*  No.  He merely advised you of the things that you would

16 be -- places you would be searching for, right?  The things you

17 would be searching for and the places you would be searching?

18 Is that right?

19 *A.*  He informed us as to the scope and the nature of the search

20 warrant.

21 *Q.*  Okay.

22 *A.*  And that's -- we took our directions from that.  After that,

23 the directions on where we were going to search were then given

24 out as people were assigned to the particular -- the smaller

25 particular areas I referred to earlier.

─── 2:15-cr-00340-RFB ───

1   Q.   Okay.

2   A.   So the search was still being conducted throughout the

3   compound or the property, but I was assigned a small part of

4   that as were other officers as well.

5   Q.   Now, this entire compound, the search took quite a long

6   time, did it not?

7   A.   Yes, it did.

8   Q.   And I've heard references to as much as 12 hours from

9   beginning to end?

10   A.   That may or may not be true.  I can't testify to that.  I

11   know that I was there several hours, and the times which I

12   arrived and the times which I left I could not repeat to you

13   because I don't know them.  It was a number of hours.

14   Q.   Okay.  Were you there at the very beginning of the search?

15   A.   The beginning of the search or the beginning of the service

16   of the search warrant?

17   Q.   Okay.  Thank you.  It is a difference, isn't it?

18   A.   Very much so.

19   Q.   When you serve the service warrant, you actually make entry

20   into the property, right?

21   A.   Yes.

22   Q.   And you confront or determine if there are people on the

23   property, correct?

24   A.   Basically, yes, that's close enough.

25   Q.   Were you part of that operation, sir?

—2:15-cr-00340-RFB—

1  *A.*  No, I was not.

2  *Q.*  Okay.  When an entry was made for purposes of conducting the

3  search on the property, were you part of that operation?

4  *A.*  Yes.

5  *Q.*  Were you there --

6  *A.*  But that was -- I don't know if you'd term that "entry."  We

7  were already present on the property.  We never left.  The

8  initial entry was performed by another unit, and we just picked

9  up after they were finished.  And then we began conducting the

10  dedicated searches delineated in the search warrant.

11        THE COURT:  So the initial entry, Detective, was

12  basically to secure the property and make sure that no one would

13  be placed in danger when conducting the actual search.  Is that

14  right?

15        THE WITNESS:  Yes, sir.  That was performed by SWAT

16  earlier.

17  BY MR. CARRICO:

18  *Q.*  Okay.  Now, from the moment that you arrived there until you

19  were allowed onto the property, can you estimate how much time

20  past?

21  *A.*  I cannot.

22  *Q.*  10 minutes?

23  *A.*  I have no idea.

24  *Q.*  An hour?

25        Okay.

1  *A.* That would be a mere guess right now.  I couldn't tell you.

2  *Q.* Okay.  Can you recall whether you were assigned particular

3  search areas before you came on the property or after you came

4  on the property?

5  *A.* It was after I came on the property.

6  *Q.* And who directed you to those places?

7  *A.* I don't remember.  I think it may have been -- I don't know.

8  It could have been Detective Mead in conjunction with another

9  FBI agent.  I'm not sure.

10  *Q.* Okay.

11  *A.* There were -- because the jobs are broken up.  There is a

12  group that is coordinating how this is going to be done,

13  obviously, and then there are others that are -- ones being

14  coordinated to do that job.  And that's what I was being

15  coordinated to do that job.

16  *Q.* Okay.  And you testified that someone directed you to search

17  the Volvo?

18  *A.* Yes.

19  *Q.* Okay.  And did someone direct you to search the

20  semi-trailer?

21  *A.* Yes.

22  *Q.* Did anyone direct you to search any other areas?

23  *A.* No.

24  *Q.* Okay.  Can you estimate for us how long it was from the time

25  that you entered the property till the time you entered the

1  semi-trailer?

2  *A.*  No, sir.  I can't.

3  *Q.*  Okay.  Was it daylight?

4  *A.*  Yes.  All this -- for my part of it, it was all during the

5  daylight hours.

6  *Q.*  In the morning or in the afternoon?

7  *A.*  I can't remember for sure.  I don't want to guess.

8  *Q.*  That's fine.

9       You did not conduct that search by yourself, did you?

10 *A.*  No.

11 *Q.*  All right.  Now, you've testified that Exhibit 3-14 -- 3-14,

12 could you look at that, please?

13 *A.*  Yes.

14 *Q.*  This is a photograph of the semi-trailer, correct?

15 *A.*  A portion of it, yes.

16 *Q.*  Yeah.  It's actually the doors are open to the trailer,

17 right?

18 *A.*  Yes.

19 *Q.*  Okay.  And you testified moments ago that you had to go in

20 probably 15 feet?

21 *A.*  Yes.

22 *Q.*  Before you encountered the safe?  All right.

23      It appears as though there's a number of things in the

24 area between the opening of the doors and 10, 15 feet into the

25 trailer.  Is that safe to say?

―――2:15-cr-00340-RFB―――

1  *A.*  It's safe to say.

2  *Q.*  You've described the weights and a blue object, right?

3  *A.*  Yes.

4  *Q.*  Now, did you stop and did you examine the things to your

5  right and your left as you proceeded into the trailer?

6  *A.*  Somewhat.  I mean, I examined the weights as much as I

7  could.  They're a little heavy for me to lift, but that's

8  pretty -- I was convinced that's all they were, though.

9  *Q.*  We'll take it that 35 pounds is 35 pounds and 50 is 50.  But

10  my question, sir, is more is whether or not you opened any

11  containers and examined any documents that you might have

12  encountered?

13  *A.*  No, not in that portion.  I did not encounter anything that

14  appeared to be that.

15  *Q.*  So in the -- until you came to the safe, had you encountered

16  anything that indicated to you that Mr. Rick Van Thiel had some

17  interest in that property?

18  *A.*  We saw some things off on the right side.  You know, I

19  mentioned earlier about the boxes of large rubber dildos and

20  porn DVDs.  And there was some other little accoutrements of

21  that type just laying on the items there, and it was -- that was

22  consistent with what we believed to be prior occupations of

23  Mr. Van Thiel.  Other than -- and finding papers, documents, we

24  had not seen those yet.

25  *Q.*  Did you see amongst what you just referred to anything

─────────────── 2:15-cr-00340-RFB ───────────────

1  bearing Rick Van Thiel's name?

2  *A.*   Not that I am aware of.  I didn't directly find any.  I

3  believe some officers and agents maybe found some things later

4  on.

5  *Q.*   And --

6  *A.*   What you are referring to.

7  *Q.*   And just to be clear.  Are you saying, sir, that you knew

8  Rick Van Thiel to be associated somehow with pornography

9  production or manufacturing.  Is that it?

10  *A.*   Yes, sir.

11  *Q.*   And you knew that before you entered the -- conducted the

12  search?

13  *A.*   Yes.

14  *Q.*   Now, you also testified a moment ago that -- well, get this

15  in front of you, too.  It's Exhibit 1.  It's the application of

16  the search warrant that Detective Mead did.

17          And --

18          THE COURT:  Which page, Mr. Carrico?

19          MR. CARRICO:  Let me just ask one preliminary question.

20          THE COURT:  Okay.

21  BY MR. CARRICO:

22  *Q.*   Did Detective Mead hand you a copy of this before you

23  executed the search?

24  *A.*   No, sir.  He did not.

25  *Q.*   Okay.

1  *A.*  That's -- I might want to add that that's not a -- that's

2  not typically done on large operations either.  These documents

3  are not handed out willy-nilly to everyone involved.  They're

4  kept in close control of usually by the agents or officers that

5  are running the investigation.

6  *Q.*  I understand.  And so when you're referring to page 2 of

7  this document, do you have that in front of you?

8  *A.*  Yes, sir.  I do.

9  *Q.*  When it lists the places to be searched in paragraph 2, all

10  rooms, vehicles, storage areas, buildings, and trailers, you

11  knew that only to such extent as Detective Mead informed you

12  that that's where you were searching, right?

13  *A.*  I don't understand your question.

14  *Q.*  Well, my question is, sir, in answering the questions from

15  the prosecutor, Mr. Grimmer, you appeared to say that you were

16  aware of the information on page 2 and that you -- in fact, you

17  said, We were only searching for those things listed on page 2?

18  *A.*  Yes, sir.  That's correct.  No, I said things that were

19  listed in the warrant.  I don't recall saying page 2.

20  *Q.*  And this is the warrant, right?

21  *A.*  This is a page within that, but this is not the entire

22  warrant, no.

23  *Q.*  Okay.  But Mr. Grimmer asked you specifically about page 2,

24  and you said the things listed, and they include computers and

25  lap tops?

—— 2:15-cr-00340-RFB ——

1    *A.*   Correct.

2    *Q.*   Okay.  But you had not read this page at the time that you

3    entered onto the property, right?

4    *A.*   I had not personally read it, no.  That page, however, had

5    been briefed to us by Detective Mead, which was part of the

6    briefing that we signed in to which was shown by the paper that

7    I signed in Exhibit 2.

8    *Q.*   Right.  And that was done immediately before you conducted

9    the search itself?

10   *A.*   It was conducted a short time prior, but I'm not sure about

11   immediately.

12   *Q.*   Okay.  And the information you got came from Detective

13   Mead's briefing, correct?

14   *A.*   Yes, sir.

15   *Q.*   All right.

16          In fact, you knew when you went in to conduct your

17   search that you were looking for evidence of the unlicensed or

18   unlawful practice of medicine.  Isn't that correct?

19   *A.*   Yes, sir.

20   *Q.*   Okay.  When you looked at Exhibit 3-14, did you see any

21   evidence of the unlicensed practice of medicine in there?

22   *A.*   Not at the first blush upon opening the doors, but that

23   would be the purpose of the search.  We have to get in there and

24   look through all of these things.  Oftentimes small tools or

25   other instruments or accouterments are going to be hidden within

1   these places where people store things.  I found that to be

2   quite frequent.  So the fact that we opened the doors and did

3   not immediately see medical equipment fall out was not a

4   surprise.

5   Q.  Well, you actually went in there because, as you stated in

6   your preliminary testimony, you were looking for evidence of

7   crimes, not necessarily limited to the unlawful practice of

8   medicine.  Isn't that correct?

9   A.  That was the earlier statement, but as I said to the

10  prosecutor earlier, I could have been more detailed in that.  At

11  its face value, we were not on a fishing expedition.  We were

12  searching for the things delineated in the warrant -- excuse me.

13  We were searching for the things delineated in the warrant for

14  the purposes that the warrant was made for.

15  Q.  Okay.  Have you had occasion to read Exhibit 1 prior to your

16  testimony here today?

17  A.  No, sir.

18  Q.  Okay.  Do you know of any crimes listed in Exhibit 1 other

19  than the unlawful or unlicensed practice of medicine?

20  A.  No, sir.  Not at this time.

21  Q.  All right.  So when you testified about the warrant back in

22  October of 2015, you were speaking about that very same warrant?

23  A.  Yes, sir.

24  Q.  And that warrant, as you've just said, authorized you to

25  search for evidence of the unlawful or unlicensed practice of

1  medicine?

2  *A.*  Yes, sir.

3  *Q.*  And it's your contention that you went into the trailer a

4  few feet and encountered a locked safe, right?

5  *A.*  Correct.

6  *Q.*  And you stopped what you were doing and called a supervisor,

7  Detective Mead?

8  *A.*  Well, he wasn't my supervisor, but he was the one that

9  was -- the officer that was in charge of what we were doing, in

10  charge of the case.

11  *Q.*  Right.  And just to kind of footnote that, it was Detective

12  Mead's case and that makes him sort of the officer in charge;

13  even though he might not be ranking, he's the guy who's

14  directing the thing, right?

15  *A.*  To a degree, yes, sir.

16  *Q.*  Okay.  That's pretty much how Metro does it.  Right.  Okay.

17          So you recall contacting Detective Mead.  And did he

18  tell you that he would call a locksmith or do you know how the

19  locksmith was contacted?

20  *A.*  I have -- I cannot answer that question at all.  I merely

21  informed them that the safe was locked.  The determination to

22  call a locksmith, how they called him, who they called, how he

23  got there, I have no knowledge of that whatsoever.

24  *Q.*  You felt that your authority extended to trying to open the

25  safe yourself, right, to test whether it was locked?

—2:15-cr-00340-RFB—

1   *A.*  Correct.

2   *Q.*  When you found out it was, you called someone, Detective

3   Mead I guess, and the next thing that happened after a short

4   time was a locksmith appeared.  Is that correct?

5   *A.*  Yes, sir.

6   *Q.*  And that locksmith, did you observe him open the safe?

7   *A.*  No, I did not.

8   *Q.*  Okay.  Did you leave the area for -- and let him work or

9   what?

10  *A.*  I stepped out of the trailer and let him work.  It was

11  rather tight quarters.  It was kind of hard to get a bunch of

12  people in there.

13  *Q.*  And it was hot, as you said?

14  *A.*  Oh, yes, sir.

15        THE COURT:  And, Detective, how long do you recall it

16  was from the time that you notified Detective Mead of the fact

17  until the locksmith arrived approximately?

18        THE WITNESS:  Sir, that would be a guess.  I would say

19  it's going to be at least an hour.

20        THE COURT:  At least an hour.

21        THE WITNESS:  At least.

22        THE COURT:  So it wasn't immediate -- it wasn't within

23  the first 30 minutes or so after that?

24        THE WITNESS:  No, it was not.  If my recollection is

25  correct, we did not have a locksmith standing by.  That's not

—2:15-cr-00340-RFB—

1   something we normally do.  He had to be called.

2           THE COURT:  Well, you think it was about an hour, and

3   then after that you saw...

4           THE WITNESS:  We looked at it again --

5           THE COURT:  You had to call the bomb squad or something

6   like that?

7           THE WITNESS:  Yes, sir.

8           THE COURT:  So that took some time for them to arrive?

9           THE WITNESS:  Correct.

10          THE COURT:  Because they weren't there initially?

11          THE WITNESS:  Correct.

12          THE COURT:  All right.  Thank you.

13          Mr. Carrico.

14          MR. CARRICO:  Yes.

15  BY MR. CARRICO:

16  Q.  And do you recall how long it took for the locksmith to open

17  up the safe?

18  A.  No, sir.  I do not.

19  Q.  Matter of minutes, perhaps?

20  A.  Minutes up to an hour, maybe more.

21  Q.  Okay.

22  A.  I don't recall.  I knew it took him a little bit.

23  Q.  We won't hold you to those time estimates, but at some point

24  the locksmith came out to your position and notified you that

25  the safe was unlocked?

1   *A.*  Yes, sir.  He did.

2   *Q.*  Did he tell you that he had opened it or simply verified

3   that it was unlocked?

4   *A.*  All I remember him saying was that, Okay.  It's unlocked.

5   You can go in and do your thing.

6   *Q.*  Okay.  Fine.

7        Were you accompanied by the other person -- by another

8   person when you went back into the trailer to examine the safe

9   further?

10  *A.*  Yes, sir.

11  *Q.*  Okay.  And what was the name of that person?

12  *A.*  I cannot recall him.  I'm sure it's in the paperwork

13  somewhere, but I don't remember.

14  *Q.*  Okay.  Now, when you came in the vicinity of the safe again,

15  was there any doubt in your mind of whether or not you were

16  going to open that safe?

17  *A.*  Provided everybody else had done their job correctly, yes, I

18  had confidence that I was going to be able to open it.

19  *Q.*  Okay.  I'm almost done here, Detective.  Thank you for your

20  patience.

21       So at the time that you opened the safe, I believe your

22  testimony was, you hadn't seen anything to indicate Detective --

23  I'm sorry -- detective.  Almost promoted him.  The defendant,

24  Mr. Van Thiel, his identity in connection with that trailer?

25       Let me untangle my own tongue here for a second.

1  *A.*  Thank you.

2  *Q.*  At the time that you went back in to look -- finally look in

3  the unlocked safe, you still had not detected anything of

4  Mr. Van Thiel's identity or other information that would

5  indicate that his -- that he belonged --

6  *A.*  With any specificity?  No.

7  *Q.*  Okay.

8  *A.*  I had not seen any documents that had his name on them yet.

9  *Q.*  And what caused you to believe that Mr. Van Thiel had, in

10  fact, possession of that trailer?

11  *A.*  Because of the pornographic-related accoutrements we saw

12  laying out next to the boxes on the right side of the trailer.

13  *Q.*  Okay.  All right.  Then you opened the safe a little bit and

14  glanced in.  Is that correct?

15  *A.*  Yes.

16  *Q.*  And you saw two firearms or did you see one firearm?

17  *A.*  No.  We saw what I believed to be one firearm.

18  *Q.*  Okay.

19  *A.*  Which was laying on top of the box, in addition to the

20  plunger device that we talked about earlier.

21  *Q.*  Okay.  I would like you to look at Exhibit 3-16.  The wire

22  hanging down on the left, is that what was connected to the

23  plunger device?

24       If you look at the safe, there seems to be a wire

25  running from top to bottom?

───────── 2:15-cr-00340-RFB ─────────

1   *A.*   I see that.

2   *Q.*   Do you recall whether that was what you were --

3   *A.*   I don't recall if that's the only one.  That's -- the

4   photograph that would show that needs to be a little higher, but

5   it looks like it may be.

6   *Q.*   Okay.  And you've indicated that on the second shelf on the

7   left-hand side, the shining spot in this photograph was a bag of

8   shells or bullets?

9   *A.*   Yes, sir.  That turned out to be the bag that you see in

10  3-17.

11  *Q.*   Okay.  So let me take you back to when you first kind of

12  picked in there.  Did you have a flashlight?

13  *A.*   No.

14  *Q.*   Okay.  So you just looked in with what light you had

15  available.  And which gun did you see first?

16  *A.*   Well, the only one that I could see and that was a partial

17  was the 9 millimeter pistol, the Hi-Point.

18  *Q.*   And did you say it was lying on top of the box?

19  *A.*   It was lying on top of the cardboard box that contains the

20  second weapon.

21  *Q.*   Okay.  So in the -- I'm a little confused.  Bear with me.

22  On the top shelf in this photograph to the right-hand side

23  appears to be -- is that a firearm on the right-hand side of the

24  top shelf?

25  *A.*   Well, poor quality photo, but it looks like it.  My guess is

—— 2:15-cr-00340-RFB ——

1  that that's probably the Hi-Point.  They just moved it and they

2  didn't use enough flash on it.  That appears to be the Hi-Point

3  pistol.

4  *Q.*  Okay.  Now, are you saying that that gun was lying on top of

5  the box that is now -- that in this photograph is on the floor

6  of the trailer?

7  **A.**  The small cardboard box that you see at the bottom of the

8  photograph that contains what turned out to be the second

9  firearm was, in fact, closed.  Those four flaps were folded on

10 top of each other.  That pistol was laying on top of those

11 flaps, and that box was on the shelf in the safe on the

12 left-hand side.

13 *Q.*  And that's the gun that you saw?

14 **A.**  Yes.

15 *Q.*  Okay.  When you opened the safe completely, did you pull the

16 evidence out for the photograph or did someone else do that?

17 **A.**  We pulled it out, but then it was repositioned for

18 photographs, which that was the FBI's job.  They -- lady moves

19 it around, takes pictures, and...

20 *Q.*  All right.

21 **A.**  When she's finished taking the pictures, then we can carry

22 on with it.

23 *Q.*  Just to be clear, however, before you did anything like

24 touching those firearms, you again contacted Detective Mead and

25 a second warrant was actually requested telephonically to seize

────── 2:15-cr-00340-RFB ──────

1  those guns.  Is that correct?

2  *A.*  Yes.

3  *Q.*  Okay.  So --

4  *A.*  So we actually got ahead of ourselves there in how that

5  happened.

6  *Q.*  So we'll assume that telephonic warrant bridge had actually

7  been crossed and we now have the thing open and we're taking

8  pictures.  And you're still there, right?

9  *A.*  Could you say that again?

10 *Q.*  We'll assume for purposes of the following questions that

11 the telephonic warrant had been obtained and you had permission

12 under that warrant to seize the guns.

13 *A.*  Correct.

14 *Q.*  All right.  So assume that.  Did you remove the gun and set

15 it on the floor?

16 *A.*  Yes, they were sat on the floor for photographs.

17 *Q.*  And do you remember reaching for the second gun and taking

18 it out, or the first gun, whichever one was on the top shelf?

19 *A.*  I don't understand your question.

20 *Q.*  Well, there's two guns in there.  There were two guns in the

21 safe you said, right?

22 *A.*  Correct.

23 *Q.*  And I only see one here on the floor.  So I'm assuming,

24 maybe incorrectly, that the one on the top right is actually

25 another firearm?

1  *A.*   Yes.

2  *Q.*   Okay.  You were there the whole time, right?

3  *A.*   Yes.

4  *Q.*   So do you recall anyone removing that firearm and doing

5  anything with it?

6  *A.*   Eventually these were both moved and opened up and laid out

7  for more detailed photographs.

8  *Q.*   Okay.

9  *A.*   This is the initial photo after the door is first opened and

10  things are kind of moved.  Oh, we can see what this is.  Then we

11  bring the FBI crime scene technician over, and they take

12  photographs.

13  *Q.*   Okay.  And that's just what I want to clarify.  We're trying

14  to make the record as clear as possible.  If we look at page --

15  excuse me -- Government's Exhibit 3-17, this is actually

16  illustrating what you just said, isn't it?  This is the MAC-10

17  taken out of the box or from the box and laid out to take a

18  photograph, correct?

19  *A.*   Yes.

20  *Q.*   And this bag of cartridges is actually the bag that you

21  referred to seeing on the second shelf of the safe?

22  *A.*   Yes, that is the bag -- that is the bag of bullets from

23  inside the safe.

24  *Q.*   Okay.  Now, on 3-18 it looks like -- and, again, forgive me

25  if I'm wrong here, but on 3-18, you see that exhibit?

—— 2:15-cr-00340-RFB ——

1   *A.*  Yes, sir.

2   *Q.*  It looks like that gun has been put into a box?

3   *A.*  No, that's not a box.

4   *Q.*  What is it?

5   *A.*  What that is is that is the top lid of a military ammunition

6   case which had been laying just inside the front doors of that

7   trailer when we opened it.  We didn't want to lay the pistol on

8   the floor of the trailer because it is extremely filthy.  So we

9   pulled the lid over, unloaded the pistol, laid it on the top of

10  this lid to take pictures, which that lid also contained, by the

11  way, you can see along the left side there's a long rectangular

12  object.  That is one of, I believe, five high-capacity magazines

13  for the MAC-10.

14          So...  But that lid was just -- that lid was used to

15  hold those magazines, and we just borrowed it to lay the pistol

16  on to take this photograph.

17  *Q.*  Had you located those prior to getting to the safe?

18  *A.*  No.  Didn't realize what that was until after we were

19  finished and we could see that down underneath some of the other

20  things next to the front door.

21  *Q.*  Now, the MAC-10 was laid on the floor, it appears, in

22  photograph 3-17.

23  *A.*  Uh-hmm.

24  *Q.*  Was that -- you felt justified because this appeared to be

25  unloaded and inoperable?

─ 2:15-cr-00340-RFB ─

1   *A.*  No, it wasn't my decision.  The other lady laid that down.

2   She's the one who came with the ruler, too.  I didn't have one

3   of those.

4   *Q.*  And the other gun which you said actually had cartridges in

5   it, and you can see some of the clips, you treated that one a

6   little more gingerly?

7   *A.*  Well, we just pulled that over because we unloaded the

8   weapon, magazine.  Loose round, you don't want it just to roll

9   away, so we just put it in the lid and lay it down so it doesn't

10  get anywhere, so it doesn't get away.

11  *Q.*  All right.

12          MR. CARRICO:  I have no further questions of this

13  witness right now.

14          (Government counsel conferring.)

15                    REDIRECT EXAMINATION

16  BY MR. GRIMMER:

17  *Q.*  Detective Matthews, now you just testified that you didn't

18  choose to search the semi-trailer by yourself.  It wasn't your

19  choice alone to be able to search the semi-trailer.  Is that

20  correct?

21  *A.*  No, sir.  It wasn't my choice on whether to search or not.

22  I was directed to continue searching that trailer after we

23  completed the search of the silver station wagon.

24  *Q.*  And you were -- you were assigned to search that trailer by

25  another individual, another law enforcement officer?

1  *A.*  Yes, sir.

2  *Q.*  Now, when you found the guns in the safe, the locked safe,

3  you testified that you stopped the search and seizure according

4  to the briefing you'd already received.  Is that correct?

5  *A.*  Yes.

6  *Q.*  And then you notified another law enforcement officer that

7  guns had been found?

8  *A.*  Yes.

9  *Q.*  And then a search warrant was obtained to seize these guns.

10  Is that correct?

11  *A.*  Yes.

12  *Q.*  Were these guns locked into evidence before or after the

13  search warrant was obtained?  Do you recall?

14  *A.*  Well, they would have to be logged in afterwards because we

15  weren't in -- we weren't in possession of them prior to that.

16  *Q.*  Okay.  Just seeking your testimony regarding that.

17  *A.*  Yes, sir.  Afterwards.

18  *Q.*  Now, let's take a look at Exhibit 1 just briefly.  Take a

19  look at, again, pages 2 and 3, specifically A through D,

20  paragraphs A through D.

21  *A.*  Yes.

22  *Q.*  Now, for instance, take a look at paragraph A.  Can you read

23  to us these three lines?

24  *A.*  For paragraph A?

25  *Q.*  Yes, please.

─2:15-cr-00340-RFB─

1        THE COURT:  I'm not sure why you would need to read it.

2   I have it, so...

3        MR. GRIMMER:  Okay.  I understand, Your Honor.

4   BY MR. GRIMMER:

5   Q.  Now, take a look at paragraph A.  Does it -- do you see that

6   paragraph A says that this is -- the items listed here are

7   related to the performance -- I'm sorry -- to the filming of

8   performed medical procedures?

9   A.  Yes.

10  Q.  And in paragraph B that this -- that it's related to

11  documents indicating medical procedures performed?

12  A.  Yes.

13  Q.  Do you see that paragraph C regards medical equipment and

14  instruments?

15  A.  Yes.

16  Q.  And D -- in D, do you see anything regarding medical

17  equipment in paragraph D or medical procedures?

18  A.  Prescription bottles.  We see other things which could be

19  dual use or multi use.

20  Q.  Okay.  Do you also see that it talks about in the first two

21  lines articles of personal property which would tend to

22  establish the identity of persons in control of said premises?

23  A.  Yes.

24  Q.  So were there other items related to the illegal practice of

25  medicine that you were seeking pursuant to this search warrant?

1          THE COURT:  Mr. Grimmer, I thought he testified that he

2     hadn't actually seen the warrant before.  So I'm not sure why

3     we're talking about the warrant.

4          MR. GRIMMER:  Yes.  Okay.

5     BY MR. GRIMMER:

6     Q.  Now, these paragraphs A through D, was the information in

7     these paragraphs what you received in oral briefings?

8     A.  Yes, sir.

9     Q.  And so these were the items you were searching for?

10    A.  Yes.

11    Q.  So you weren't searching for, for instance, something which

12    on its face may just be a medical mask or medical equipment?

13    A.  No.

14         THE COURT:  Well, hold on.  When you had the briefing,

15    Detective Mead didn't read through the whole warrant, did he?

16         THE WITNESS:  No, sir.  The information in those

17    paragraphs was related to us verbally by Detective Mead in the

18    briefing.

19         THE COURT:  Do you remember -- I'm sorry.  Can you try

20    to remember what he said?  Because obviously he didn't go

21    through -- it doesn't appear at least from what you've testified

22    that he read through every word in the warrant, but that he

23    provided an overview I think is what you said and summary of

24    what you were looking for.  Is that right?

25         THE WITNESS:  Yeah, but they were specific about the

—— 2:15-cr-00340-RFB ——

1  things we were looking for.

2          THE COURT:  Okay.  So can you tell me specifically what

3  you recall that he was specific about in the briefing itself?

4          THE WITNESS:  They were specific to computers, any type

5  of computer equipment, any type of digital record-keeping

6  devices, any type of shortage devices, cameras, medical records

7  including both paper and digital, medical tools including drugs,

8  possibly narcotics.  And the standard thing which is in all of

9  the warrants that I've performed which there are papers and

10  other things as delineated in the last paragraph showing

11  possession of a place that we're searching.

12          So all of these things were relayed to us verbally in

13  the briefing, and we were not handed copies of the affidavit and

14  the search warrant.  That was kept by Detective Mead and other

15  limited number of detectives, but it was relayed to us verbally.

16          THE COURT:  Okay.  Thank you.

17  BY MR. GRIMMER:

18  Q.  Would you agree that the oral briefing of these items was

19  more expanded than the summary you just gave on the stand?

20  A.  Yes, because it came from the gentleman that wrote it.

21  Q.  Looking briefly at 3-14.  This is the picture of the back of

22  the opened semi-trailer.  Is that correct?

23  A.  Yes, it is.

24  Q.  It's your testimony that in -- that in looking at the first

25  part of the semi-trailer, you didn't see at least in this

—2:15-cr-00340-RFB—

1  picture anything which would lead you to belive that there were

2  medical equipment within the first few feet of this trailer?

3  *A.*  No, sir, not yet.  Not at that point, no.  The medical

4  equipment can be very small, you know.  They can be large, they

5  can be small, and they can be many sizes.  They're easy to hide.

6  Some medical items could be hid on your person.  Without any

7  clothes on they could be hidden.  So we had to look thoroughly

8  through all of these things, even though when the doors first

9  opened, we might not see them obviously laying there in front of

10 us.

11 *Q.*  So your testimony would be that after opening the doors and

12 looking at what you saw first, you wouldn't necessarily close

13 the doors and consider the trailer having been searched?

14 *A.*  No.  As a matter of fact, my first thought when I opened the

15 doors is, Holy cow.  This is going to take a while.

16        THE COURT:  Have you, Detective, ever had any

17 experience searching for medical equipment on a similar

18 allegation that you can recall?

19        THE WITNESS:  Not for this type of allegation, but I

20 have searched for that type of equipment before.  But usually

21 it's -- those are things that are -- may be used in the -- in

22 narcotics trade.

23        THE COURT:  Okay.  Thank you.

24        MR. GRIMMER:  No further questions, Your Honor.

25        THE COURT:  Thank you, Mr. Grimmer.

—— 2:15-cr-00340-RFB ——

1          Mr. Carrico.

2          MR. CARRICO:  I don't believe I have any recross, Your

3   Honor.

4          THE COURT:  Okay.  Detective, you're excused.  Thank

5   you for your time today.

6          THE WITNESS:  Thank you, sir.

7          (Whereupon testimony concluded at 2:38 p.m.)

8                       --oOo--

9              COURT REPORTER'S CERTIFICATE

10

11      I, PATRICIA L. GANCI, Official Court Reporter, United

12   States District Court, District of Nevada, Las Vegas, Nevada,

13   certify that the foregoing is a correct transcript from the

14   record of proceedings in the above-entitled matter.

15

16   Date:  August 19, 2016.

17                              /s/ **Patricia L. Ganci**

18                              Patricia L. Ganci, RMR, CRR

19                              CCR #937

20

21

22

23

24

25